**UNITED STATES ex rel. Charles CLARK, Petitioner-Appellant,**

v.

**James FIKE, Respondent-Appellee.**

No. 75–1787.

United States Court of Appeals,
Seventh Circuit.

Argued April 26, 1976.
Decided July 13, 1976.

752

Lee H. Tockman, Chicago, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., George C. Sorensen, Asst. Atty. Gen., Chicago, Ill., for appellee.

Before CUMMINGS, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This habeas corpus case primarily concerns instances of prosecutorial misconduct committed during petitioner's trial in state court which allegedly deprived petitioner of a fair trial.

I

The petitioner, Charles Clark, was convicted and sentenced to death for the 1967 murder of an off-duty Chicago policeman killed near a southside shopping center. On direct appeal to the Illinois Supreme Court, his conviction was affirmed but the sentence of death was vacated because the Illinois death penalty statute had been held unconstitutional in *Moore v. Illinois,* 408 U.S. 786, 800, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). *People v. Clark,* 52 Ill.2d 374, 288 N.E.2d 363, 373 (1972). On resentencing, he was sentenced to serve from 100 to 200 years in the penitentiary.

The underlying factual situation of this petition is set out in considerable detail by the Illinois Supreme Court in *People v. Clark,* 52 Ill.2d 374, 288 N.E.2d 363 (1972), and does not need to be so painstakingly set forth here. A few rudimentary facts will suffice. On the evening of December 13, 1967 shortly before 8:30 p. m., Officer John Collins and his wife Barbara were leaving a Sears Roebuck and Company store in a shopping center at 79th and Kenwood in Chicago. As they were walking to their car in the parking lot, they noticed a black man bending over the vent mirror of their car. When the man noticed their approach, he started to walk away but was intercepted by Officer Collins who had walked around to the other side of the car. Officer Collins inquired as to what the man had been doing by the car. No answer was given, but instead when the man noticed the gun which Officer Collins had been hiding behind his back, he said, "Oh, you have a gun. Well, I have one, too." He stepped back and pulled a small, black snubnosed gun from his jacket pocket. Officer Collins told him to drop the gun, that he was a police officer. The man yelled back that he too was a police officer and told Collins to drop his gun. The man then grabbed Mrs. Collins around the neck and held her in front of him. Officer Collins backed away and again ordered the man to drop the gun. The man fired; Mrs. Collins screamed and dropped to the ground; and Officer Collins returned the shot. The man fled across the parking lot with Officer Collins in pursuit.

At this point a Sears garage employee, Roger Van Schaik, picked up the narrative. He testified that he had been assisting a woman start her car in the Sears parking lot at 79th and Kenwood when he observed a white man chasing a black man across the parking lot. The white man, whom Van Schaik later identified from a morgue photo as Officer Collins, was shouting "halt" and firing into the air. The two men ran across Kenwood Avenue and into a gangway between two homes opposite the parking lot.

Van Schaik heard scuffling and another shot. When he got to the gangway, the black man was fleeing out a back gate and Officer Collins, crumpled against the side of a house, was slumping to the ground. Officer Collins died shortly after arriving at Jackson Park Hospital with a gunshot wound in his brain.

The petitioner was arrested about three weeks later on January 2, 1968 and was identified in two lineups that evening. He was tried and found guilty in May of 1968. In 1972, the sentence of death was vacated on appeal to the Illinois Supreme Court, but in other respects, his conviction was affirmed.

The petitioner claims that he was deprived of a fair trial and thus imprisoned in violation of the laws and Constitution of the United States in four major ways. First, he contends that pretrial and trial identification procedures were improperly suggestive. Second, he contends that certain prosecutorial actions and comments deprived him of a fair trial. Third, he contends that the bailiff's communications to the jury were prejudicial. Finally, he contends that the exclusion of jurors who had reservations about the death penalty created a jury biased towards conviction.

II

The petitioner challenges both the in-court and the out-of-court identification procedures used by the state in this case.

Four witnesses identified the petitioner as the man whom Officer Collins chased across the parking lot on the night in question. Mrs. Collins testified that she saw him clearly while she was on the ground immediately after he had first fired at her husband, because he turned and faced her as if to shoot her. She viewed two lineups prior to trial. At the first, she saw someone who resembled the petitioner in facial characteristics but not in build. At the second, she identified the petitioner out of a five-man grouping. Two other potential witnesses attended this lineup, but could not identify the petitioner.

The three other identification witnesses were all bystanders in the parking lot at the time of the chase. Although it was night at the time, the lot was well lit. Each witness had a good view of the scene. Edward Buchsbaum selected the petitioner as the man in the parking lot out of a five-man lineup and testified to this selection in court. Robert Pulizzi who made an in-court identification of the petitioner, was also present at this lineup with Buchsbaum. Pulizzi identified the petitioner by number in the lineup, but never confirmed this identification by walking to the front of the room and placing his hand on the petitioner's shoulder as Buchsbaum had done. While Pulizzi was walking towards the front of the room, a shriek of obscenities rang out from some of the petitioner's relatives who were present, and Pulizzi fell faint against a locker in the room. Pulizzi never testified to his aborted lineup identification at trial. Mrs. Ruth Kent, the final identification witness, made only an in-court identification of the petitioner.

The petitioner challenges the two lineups at which he was identified as impermissibly suggestive because more than one prospective witness attended each lineup and because procedures were used which singled out the petitioner. The petitioner challenges the in-court identification by Mrs. Collins and Messrs. Buchsbaum and Pulizzi as irreparably tainted by the prior lineups. Finally, the petitioner challenges the in-court identification by Mrs. Kent on grounds of unreliability because petitioner was the only black person at counsel table.

A

A hearing was held in state court prior to trial on a motion to suppress the identification testimony concerning the two lineups. Nine witnesses testified including the petitioner. The petitioner's witnesses testified in substance to three factors which singled out the petitioner in both lineups: (1) that the petitioner wore a different colored jacket from the rest of the lineup; (2) that the petitioner was required to repeat the phrase "I'm a policeman, too; drop the gun," three

times while other participants were required to say it only once; and (3) that just prior to identification by the witnesses, a policeman came up and placed his hand on the petitioner's shoulder or suggestively stood behind the petitioner. The police officers who conducted the lineup both testified that all members of the lineup wore the same type of jacket though not the same color. They testified that at no time shortly prior to identification did any officer touch the petitioner or stand behind him. Although there was some disparity between the officer's testimony regarding speaking the line, "I'm a police officer, too; drop the gun," both officers clearly indicated that the petitioner was not singled out to say it more times than anyone else. At the end of the hearing, the trial court denied the motion to suppress.

Although the court gave no reasons for the denial, it obviously credited the officers' testimony as against that of the petitioner's witnesses on the issue of whether the petitioner was singled out. In cases where written findings of fact are made by the state court, the federal court in a habeas corpus proceeding must defer to that court's findings unless they are not fairly supported by the record. 28 U.S.C. § 2254(d)(8). Here, no written findings were made, but the question that petitioner raises and the substance that petitioner argues concerns the facts which derive from the state court hearing. Petitioner challenges neither the adequacy of the hearing, nor the standard the trial court applied. Thus, as to the factual questions resolved at the hearing, we are in no position to overrule the state trial court which heard the witnesses and could judge their credibility. Moreover, there is nothing inherent in the record of the hearing that would demand a conclusion contrary to that of the trial court. Thus, we cannot say that the two lineups were impermissibly suggestive, in that they singled out the petitioner.

We have previously addressed the question of the presence of more than one identification witness at a lineup at one time, and have severely criticized the practice.

*United States ex rel. Pierce v. Cannon,* 508 F.2d 197, 200 (7th Cir. 1974). However, as was noted in *Pierce,* when dealing "with the adequacy of state lineup procedures . . . the only question before us is whether the procedures employed violated petitioner's due process rights." *Id.,* at 202. In a consideration of this question, the *Pierce* court held that the "totality of the circumstances" must be examined to see if there was "a substantial likelihood of misidentification." *Id.,* at 203. The *Pierce* court set out the so-called *Biggers* factors, *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), which it saw as the relevant factors in a "totality of the circumstances" consideration. These factors include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.*

In consideration of Mrs. Collins' identification of the petitioner while other witnesses were present, we need not even consider these factors since the other prospective witnesses could not make any identification and thus could not have influenced the identification made by Mrs. Collins.

In regard to Buchsbaum's identification of the petitioner, we cannot say that the presence of Pulizzi, who made a preliminary identification, was not at least slightly suggestive. Thus, Buchsbaum's identification must be examined in light of the *Biggers* factors.

First, Buchsbaum had a good opportunity to view the petitioner in the Sears parking lot. He testified that he was 10 to 15 yards away from the black man when he first noticed the altercation and that he was only 8 or 9 feet away when the two men ran past. The lighting was good. Buchsbaum's attention, although broken by his ducking momentarily behind an automobile,

appears sufficient for him to have related the incidents of the parking lot altercation with clarity. Buchsbaum's initial description of the petitioner is not reflected in the record and thus cannot be considered. Buchsbaum demonstrated a high level of certainty at the lineup and the length of time between the lineup and the crime was only three weeks. Under the *Biggers* analysis as described in *Pierce,* Buchsbaum's identification of the petitioner shows little likelihood of mistaken identification which might have been created by the presence of Pulizzi and, thus its use did not deprive the petitioner of a fair trial.

Since the lineup which Mrs. Collins viewed was not suggestive, and since Edward Buchsbaum's identification of the petitioner at the lineup was not significantly influenced by Pulizzi's presence, we find no basis for challenging their subsequent in-court identifications. Therefore, these must also stand.

### B

The petitioner challenges Robert Pulizzi's in-court identification on the ground that his presence at the lineup at which Buchsbaum identified the petitioner gave rise "to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The same *Biggers* factors apply in determining whether there was a likelihood of misidentification.

In considering these factors, we note that Buchsbaum and Pulizzi exited the store together, were very near each other in the parking lot when the events took place and gave strikingly similar testimony. The only *Biggers* factor applicable to Pulizzi which differs significantly from those regarding Buchsbaum concerns prior description. Pulizzi admitted on the stand that he had told the police that the black man in the parking lot looked 40 years old. The petitioner at the time of trial was 25, but Pulizzi from the stand estimated his age at 35, a judgment shared by other witnesses. We cannot say that the discrepancy here

was so great as to show a very substantial likelihood of irreparable misidentification.

### C

Finally, the petitioner challenges the in-court identification testimony of Mrs. Ruth Kent. The petitioner contends that Mrs. Kent's in-court identification of the petitioner was inherently unreliable because of three factors: 1) she had been present at a meeting of prosecution witnesses where the description of the petitioner was discussed; 2) five months had elapsed between the incident and the first time Mrs. Kent identified the petitioner; and 3) when Mrs. Kent made the in-court identification, the petitioner was the only black man sitting at counsel table. The major objection revolves around this third factor in that the petitioner argues that irreparable misidentification took place because the only possible person Mrs. Kent could have identified was the black man sitting at counsel table. The petitioner's motion for an in-court lineup at which Mrs. Kent could make an identification was denied by the trial court.

The essence of petitioner's contention was dealt with by the Illinois Supreme Court on direct appeal. *People v. Clark,* 52 Ill.2d 374, 387–88, 288 N.E.2d 363, 370 (1972). The court there noted that the petitioner had no right to an in-court lineup and quoted the following passage from *State v. Brown,* 76 Wash.2d 352, 353, 458 P.2d 165, 166 (1969):

> Defendant's racial attributes were a mere identifying characteristic. We can envision white defendants who could well be the only one [sic] in the room with red hair, a crew cut, or a beard. The prosecution is not required to pack a courtroom with blacks or people who resemble a defendant, in order to insure a proper identification.

Although a person's race is more than a *mere* identifying attribute, and although more than a mere possibility of misidentification exists when a witness in the witness box is faced with having to make an identification not having seen the perpetrator for five months, we must note that a defendant in a criminal trial as yet has no right to an

in-court lineup. *United States v. Moss,* 410 F.2d 386 (3d Cir. 1969). Moreover, Mrs. Kent's testimony remained credible and unshaken after a thorough cross-examination by competent counsel. Petitioner's arguments here were arguments which he properly made to the jury during trial. Mrs. Kent's testimony was neither so unreliable, nor so fraught with the possibility of misidentification that petitioner was denied a fair trial. What inconsistencies existed, were properly for a jury and not a reviewing court to consider.

### III

The petitioner points out three areas of prosecutorial misconduct which he contends denied him a fair trial. First, during trial in a controversy over the petitioner's height, the prosecutors measured the petitioner without establishing any foundation for the measurement and testified to the results of the measurement without being under oath. Second, the prosecutors conducted a pretrial meeting of the major prosecution witnesses at which some substance of the witnesses' testimony was discussed. Third, the prosecutors engaged in a number of instances of improper argument during closing statements to the jury.

### A

During cross-examination of the petitioner, the subject of the petitioner's height was raised. The petitioner stated that he was five feet-seven inches. The prosecutor thereupon asked the petitioner to leave the witness box and stand on the floor. The prosecutor and his assistant took a tape measure, placed the one foot mark at the floor, and read off six feet-ten inches at the top of petitioner's head. From this the prosecutors concluded in front of the jury that the petitioner was five feet-ten inches tall. It is clear from the record that the prosecutors were not under oath when they testified as to this measurement nor was the tape measure validated in any way. Petitioner's counsel made timely objections. The petitioner claims that this unsworn testimony from the prosecutors denied him a fair trial especially in light of the fact that the petitioner had testified that he was five feet-seven inches tall.

A trial is an adversary process governed by strict rules. The ultimate goal of the process is to determine the truth. Here the prosecutors engaged in some obviously unorthodox procedure to challenge the petitioner's assertion that he was five feet-seven inches tall. In the process they broke at least two of the rules which govern a trial, that unsworn testimony should not be admitted and that foundation should be shown for any in-court procedure of this nature. However, it is difficult to see any improper prejudice arising from these actions.

First, the prosecutors' actions surely opened up the field for the defense to try its own measurements in court, if the prosecutors' measurements were wrong. Second, the trial court actually allowed the defense to introduce the petitioner's jail identification card into evidence which recorded petitioner's height at five feet-seven inches. This lacked foundation and violated the hearsay rule. The crux of why the prosecutors' actions created no prejudice to petitioner, however, was that in this case the truth was so easily determined. If petitioner was five feet-seven inches tall, his counsel could have brought in a standard device made for measuring height and cleared up the dispute. The most likely reason that the matter was not rectified by defense counsel was that petitioner was substantially taller than five feet-seven inches. Although the prosecutors overlooked the fact, the petitioner had testified at a prior hearing on a motion to suppress that he was five feet-nine inches tall. In a situation such as this, in which the truth can be easily ascertained without any undue burden to the defense and in which the court bent over backwards to allow the defense an opportunity to challenge the prosecutions' assertions, the defense cannot claim harmful error only because prosecutorial conduct violated some rules of the adversary process.

This comports with our traditional analysis of such questions in habeas corpus cases. As this court said in *United States ex rel. Harris v. Illinois,* 457 F.2d 191, 198 (7th Cir. 1972):

> Generally, . . . the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved.

Similarly in *United States ex rel. Bibbs v. Twomey,* 506 F.2d 1220, 1223 (7th Cir. 1974), we noted:

> [E]videntiary questions are not subject to review by a federal court in a habeas corpus proceeding by a state prisoner unless there is an error of such magnitude as to deny fundamental fairness. . . . In this area, federal courts must proceed with caution. . . . To hold otherwise would put federal courts in the role of reviewing courts over the courts of the states even when no constitutional errors have been made.

In this case, the admission of measurements made by the prosecutors was an evidentiary question for the state courts, and although improper, the error was not of such magnitude as to deny fundamental fairness.

### B

The petitioner next contends that a pretrial meeting attended by the prosecutors and the major prosecution witnesses deprived petitioner of a fair trial. Although it is hard to determine just what was discussed at this pretrial meeting, it seems clear that at least some of the witnesses discussed their general impressions of the petitioner. The fact that the petitioner was "substantially younger" than age 40 contrary to a prior statement of at least one witness was aired. However, discrepancies were not ironed out, nor did the witnesses have a general discussion of their prospective testimony among themselves. Petitioner's trial counsel used the fact of this meeting to impeach the testimony of two witnesses, but made no objection to the meeting during trial, nor did he raise it on appeal. Petitioner now contends that this meeting deprived him of a fair trial by removing discrepancies in witnesses' testimony denying him effective impeachment and cross-examination and in effect violating the trial court's order of sequestration.

The petitioner is correct that the appropriate context in which to examine this meeting is whether it violated an order of sequestration. The prosecution and the defense both have the right to interview witnesses prior to trial and review with them their trial testimony. The impropriety here occurred not because of the meeting between prosecutor and witness, but because of the presence of other witnesses who overheard prospective testimony. This is exactly what happens when a witness violates a sequestration order.

This court has held that it is within the sound discretion of the trial court to allow a witness who has disobeyed a sequestration order to testify. *United States v. Schaefer,* 299 F.2d 625 (7th Cir. 1962). The Supreme Court in an early case stated the general rule as follows:

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.

*Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). And finally, the Ninth Circuit's comment in *Taylor v. United States,* 388 F.2d 786, 788 (9th Cir. 1967), in regard to violation of sequestration orders is particularly applicable here:

> Since the purpose of the order is to gain assurance of credibility and its violation is a legitimate subject of comment in this respect, it seems proper that unless the violation has somehow so discredited the witness as to render his testimony incredible as a matter of law he should not be disqualified from testifying.

■ The rule that the prosecution cannot bring all its witnesses together prior to trial to discuss their testimony is one to ensure the credibility of the witnesses. That the witnesses in this case did meet together, and did discuss some aspects of their testimony was a proper subject for impeachment on cross-examination and for comment during closing argument. However, the violation here is not so extreme as to render the witnesses' testimony incredible as a matter of law, nor is it so extreme as to deny the petitioner fundamental fairness in his trial. As was noted in the section immediately prior to this, questions of admissibility of evidence are determined by state law and are not reviewable in a federal habeas corpus proceeding unless there has been an error of such magnitude as to deny fundamental fairness. Although the actions of the prosecutors here were improper, the witnesses' testimony was admissible, and its admission did not deny petitioner a fair trial.

## C

The final acts of prosecutorial misconduct of which the petitioner complains occurred during closing statements to the jury. The petitioner points to four specific instances.

■ The petitioner first contends that the prosecutor improperly called the defense witnesses perjurers. As shown by the following excerpt, the prosecutor did exactly that:

And I submit to you there has been perjury, as Mr. Echeles said there wasn't. I submit there has been perjury in this case. What is the defendant's witnesses purpose for lying? First of all, you will hear and you should take into consideration the affinity of the witnesses for the defendant, their hope for the outcome of the case. And, obviously, the outcome that the defense witnesses want is the acquittal of the defendant. They are friends, relatives, girlfriend of this defendant. They have a motive for lying.

However, the prosecutor's comments were in response to the following statements made in argument by defense counsel:

. . . the opinion of the clean people, who took the stand, who worked and saved their money to buy a little home on contract, said Mrs. Barrett, would perjure herself into purgatory for a man she doesn't even like, when she said he was home on the night and I know? And however Mr. Friedman tried to break her down and confuse her, she said he was there.

You saw and heard Mrs. Audrey Barrett. If you think she perjured herself deliberately and committed the crime of perjury, and that all the state's witnesses were not mistaken, their evidence is clear and convincing to you beyond a reasonable doubt, then I haven't done my job here for you people, because I work for you as well as for the defendant.

Although calling defense witnesses perjurers is "ill-considered," *United States v. Jansen*, 475 F.2d 312, 317 (7th Cir. 1973), certainly in the face of defense counsel's assertion that either the defendant was innocent or the defendant's witnesses perjured themselves, it was not wholly improper for the prosecutor to make such a reply. "Having opened the subject by [making this argument], defense counsel invited Government counsel to advance his own argument in reply." *United States v. Guajardo-Melendez*, 401 F.2d 35, 40 (7th Cir. 1968). Moreover, the context of the prosecutor's statement makes clear that his remark was not as the petitioner contends based on his personal knowledge of matters outside the record.

The petitioner's second contention involves the following prosecutorial comment:

Ladies and gentlemen, you heard that the People of the State of Illinois are bringing this prosecution. I am an assistant State's Attorney and so is Mr. Friedman. We represent the entire spectrum of the people of the State of Illinois, including until your verdict, that defendant (indicating). We have an obligation, ladies and gentlemen. We take an oath to be fair, to be just to the people of the State of Illinois including that defendant. We don't cavalierly go about prosecuting peo-

ple for the sheer joy of prosecuting people. This man has committed a dastardly crime, he should be punished. You know it, I know it and the courtroom knows it.

To this comment, defense counsel immediately interposed an objection:

I object, your Honor, to the last conclusion. Everybody in this courtroom does not know it. I move that be stricken.

The court allowed the last portion to be stricken. The petitioner contends that the statement taken as a whole was an improper attempt by the prosecutor to place the official backing of his office behind the contention that the petitioner was guilty.

■■■■■ The last sentence of the above quoted comment is an improper assertion of the prosecutor's personal knowledge. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). However, this sentence was stricken. Since the sentence alone was not egregious, any prejudice therefrom was cured by the timely objection of defense counsel and appropriate action of the court.

Taken as a whole the quoted passage does reflect an improper attempt on the part of the prosecutor to bolster the prosecution by calling on the official backing of his office. However, this passage came in response to a number of assertions by defense counsel. Defense counsel called the prosecution a "dirty prosecution" at one point and a "farce and falsity" at another. He insinuated that the government assisted uncertain witnesses make out-of-court identifications and that it persuaded other witnesses to change their testimony to fit more accurately petitioner's characteristics. Finally, defense counsel suggested in closing argument that he also held a position somewhat apart from that of an advocate by telling the jury that he worked for them as well as the defendant.

■■■■■ As noted earlier, the prosecution has a right to respond to assertions of defense counsel. Here the response was neither an over-reaction nor wholly unreasonable. Although it is always improper for the prosecution to suggest that a defendant is guilty from the mere fact that he is being prosecuted, in this context with part of the comment stricken and the other part made in response to defense assertions, we cannot say that the comment deprived the petitioner of a fair trial.

■■■■■ The third and fourth instances will be treated together. Regarding the third instance, the petitioner contends he was denied a fair trial because the prosecution three times during argument to the jury suggested that the petitioner engaged in criminal activity to support himself. The first two times this occurred no objection was made; so we dwell mainly on the last occurrence which goes as follows:

Prosecutor: How was he [Charles Clark] sustaining them [the woman he lived with and a child]? Not ladies and gentlemen on the product of these bank books, not on eight hundred dollars from the Chesterfield Savings and Loan, not on the product of these bank books. But, I submit, it is a fair inference, from the facts and circumstances in this case, that he was out doing every other night just what he was doing that night.

Defense Counsel: I object, your honor.

The Court: The objection is overruled and your motion will be denied.

Nothing was in evidence as to the petitioner's exploits "every other night." The only prior criminal arrest the petitioner had was for vagrancy. Under no "fair inference" could the jury conclude from the evidence that the petitioner supplemented his bankbooks through criminal activity. Clearly, the prosecutor's remarks were improper.

The fourth instance involves the following prosecutorial statement:

What are you going to tell men like Charles Clark in a situation like that? What are you going to tell the community and what are you going to tell twelve thousand other Chicago policemen? What choice should they make?

The petitioner points out that the trial took place only a month after the tragic 1968 "Martin Luther King riots" in Chicago and that public concern at the time over safety in the streets was significantly heightened.

Viewed in this context, the petitioner contends that the statement was highly inflammatory and prejudicial.

In considering these two instances of prosecutorial misconduct, we find the standard as outlined by Judge Will in *United States ex rel. Kirk v. Petrelli*, 331 F.Supp. 792, 795–796 (N.D.Ill.1971) helpful:

> The question to be decided is whether the above quoted statements were so inflammatory and prejudicial to the defendant petitioner as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as proscribed by the Fourteenth Amendment. The standard for the Court to apply in making a determination of whether the petitioner was afforded a fair trial is [by] jurisprudential necessity a broad one. As with many issues of Fourteenth Amendment due process, each case must be decided on its unique facts. Prior cases unless on all fours factually with the instant case are of little assistance.

In that case, five instances of improper argument were noted including statements by the prosecution suggesting that defense witnesses lied, that the defendants paid for the testimony of their witnesses, that the defense attorneys used a doctrine which Adolph Hitler used, and that the jury by their verdict should "show a community on the south side of Chicago [impliedly the black community] that . . . jurors don't tolerate senseless killing." 331 F.Supp., at 795. Judge Will concluded that the aggregate effect of these statements did not involve a deprivation of constitutional rights.

Cases which dealt with improper argument prejudicial enough to require a new trial, whether through reversal or through granting a habeas corpus petition, show either a wilful and deliberate course of prosecutorial misconduct evidencing a design to improperly prejudice the defendant. *United States v. Gonzalez*, 488 F.2d 833, 836 (2d Cir. 1973), ("The summation . . . contained a host of infirmities . . . consistent with a repeated pattern of misconduct by this prosecutor . . . these comments were unprovoked and . . . neither trivial nor few."), *United States v. Drummond*, 481 F.2d 62 (2d Cir. 1973) (same prosecutor as in *Gonzalez*), *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), or a serious misstatement of the law or the facts which has the probable effect of misleading the jury, *United States v. Phillips*, 527 F.2d 1021, 1022 (7th Cir. 1975) (suggestion by prosecutor that if jury were to find defendant innocent, they would also have to find the prosecutor guilty of conspiring to violate the civil rights of the defendant), *Reichert v. United States*, 123 U.S.App.D.C. 294, 359 F.2d 278 (1966) (argument by prosecutor that government witnesses were reliable because, although defense had received Jencks Act statements, they had not used these to impeach witnesses), *Greenberg v. United States*, 280 F.2d 472 (1st Cir. 1960) (suggestion by prosecutor that he was "a sort of 13th juror" who applies his training in analyzing the evidence).

■ The improper argument present in this case when read as a whole does not evidence a design to improperly prejudice the defendant nor was the conduct a serious misstatement of the law or facts which had the probable effect of misleading the jury. The conduct here was improper, but a federal court's function in a habeas corpus proceeding is "not to correct errors committed in a state trial." *Jackson v. California*, 336 F.2d 521, 524 (9th Cir. 1964). The errors committed in this case during closing argument did not deprive the petitioner of a fair trial as the right to due process guarantees.

## IV

The petitioner next contends that the bailiff's communication to the jury during their deliberations denied him a fair trial. About two and a half hours into their deliberation, the jury rang the buzzer. When the bailiff inquired whether they had reached a verdict, the jurors responded "No, we haven't, but we'd like to ask a few questions." The bailiff responded, "There's

no questions to be answered. You have all the instructions in front of you and all the evidence. That's all that can be done." The petitioner contends that this was tantamount to an "Allen charge" and hence requires the granting of the petition under *United States ex rel. Tobe v. Bensinger*, 492 F.2d 232 (7th Cir. 1974).

In *Tobe* the jury during their deliberations asked a number of questions concerning whether they had to reach a unanimous verdict. The bailiff responded in essence that the jury had to keep deliberating until it reached a unanimous verdict. This court viewed the bailiff's communications as "akin to an 'Allen charge' instruction, without the admonition that no juror should relinquish his conscientiously held convictions to join in a majority verdict," 492 F.2d at 238, and affirmed the grant of the habeas corpus petition.

■ In the present case, the communication of the bailiff to the jurors in no way resembled an "Allen charge." The bailiff's response merely indicated that no questions could be answered and that if the jury needed information they should look to the instructions. This was the proper response since at that time no questions could be answered. The judge was at dinner. Defense counsel was across town at a policeman's banquet. The judge had made it clear to counsel that he would not answer any jury questions without all counsel being present. Although the bailiff's answer certainly squelched the jury's question, it had no coercive impact. The *Tobe* holding is not applicable to this situation in which the bailiff's communication, although blunt was

non-coercive. Nor is there any other prejudice apparent from the bailiff's remarks.

## V

Finally, the petitioner contends that the systematic exclusion of jurors with scruples against the death penalty created a jury biased towards conviction and denied the petitioner a fair trial. During voir dire, thirteen jurors out of a venire of sixty-four were excused for cause when they expressed moral scruples against imposition of the death penalty. The petitioner contends that this resulted in a "conviction prone" jury.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that a death sentence imposed by a jury from which those who had scruples against the death penalty had been removed was not an "impartial" jury on the issue of punishment and hence the sentence of death had to be vacated. However, on the question of whether the same jury was "conviction prone" because of the removal of all prospective jurors who had scruples about the death penalty, the Court held that at the time of consideration, "[t]he data adduced by the petitioner  .  . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." 391 U.S. at 517, 88 S.Ct. at 1774.

The data the Court had before it in *Witherspoon* (and a companion case *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)) consisted of two studies and preliminary versions of two other studies.[1] These four studies which the

---

1. The two complete studies before the Court were: Oberer, *Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?* 39 Tex.L.Rev. 545 (1961) (cited in *Witherspoon*, 391 U.S. at 516 n.9, 88 S.Ct. 1770); R. Carson, An Investigation Into Certain Personality Variables Among Capital Trial Jurors (Western Reserve University doctoral dissertation, 1966) (cited in *Bumper*, 391 U.S. at 546 n.6, 88 S.Ct. 1788). The Court had before it in preliminary versions these two studies: Goldberg, *Attitude Toward Capital Punishment and Behavior as a*

*Juror in Simulated Cases* (cited in *Witherspoon*, 391 U.S. at 517 n.10, 88 S.Ct. 1770); H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (cited in *Witherspoon*, 391 U.S. at 517 n.10, 88 S.Ct. 1770).

The final versions of these studies are:

Goldberg, *Towards Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data to Raise Legal Presumptions*, 5 Harv.Civ. Rights—Civ.Lib.L.Rev. 53 (1970); H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment (1968).

Court held "too tentative and fragmentary" all suggested that jurors who held no scruples concerning the death penalty were more prone to convict a defendant, than those who held scruples. When this circuit considered the same question in *United States ex rel. Townsend v. Twomey*, 452 F.2d 350, 363 (7th Cir. 1972), one further study was considered.[2] We held that this study was insufficient "to overcome the determination reached by the Supreme Court [in *Witherspoon*] that the data are 'too tentative and fragmentary.'" *Id.* The petitioner cites three more studies and contends that these along with the five prior studies establish that a "death qualified" jury is unrepresentative on the issue of guilt and substantially more prone to render a guilty verdict.

Of the three new studies cited by the petitioner, only one provides a scholarly treatment of new data which could significantly add to the evidence in the field. Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971). Of the other two, one is a Louis Harris poll[3] and the other is a reinterpretation of data from a prior study.[4] These latter two provide no substantial addition to the scholarly data in the area.

The Jurow study which was taken of more than 200 employees at the Sperry Rand Corporation appears to be a highly scholarly undertaking to collect data on the effect a juror's attitude toward the death penalty has upon the guilt determination process. The study involved hypothetical cases on which the participants were to render verdicts and a number of questionnaires designed to elicit the participants' attitudes towards capital punishment, their tendencies towards conservatism or liberalism, their authoritarian traits and their tendencies towards punitiveness. After analysis of the results garnered from 211 Sperry Rand employees, the author concluded that "[t]here was evidence relating a favorable attitude toward capital punishment and a tendency to convict." 84 Harv. L.Rev. at 598.

The Jurow study and the five studies considered by this court in *Townsend* show a pattern of correlation between a juror's attitude toward the death penalty and his attitude toward conviction in a particular trial. Since the Supreme Court has let decision on the question rest on empirical analysis, however, we cannot say that the addition of two studies (Jurow and Bronson) as thorough as these might be, dispel the *"fragmentary and tentative"* nature of the data or significantly increase the empirical evidence on the question. Thus, at this time, we cannot say that the petitioner was denied a fair trial because jurors who had scruples against the death penalty were excluded from his jury.

The district court's denial of the petition for habeas corpus is affirmed.

AFFIRMED.

---

2. This study was: Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U.Colo.L.Rev. 1 (1970) (cited in *Townsend*, 452 F.2d at 363 n.6).

3. Louis Harris & Associates, Harris Poll—Study No. 2016 (1971).

4. Rokeach and McLellan, *Dogmatism and the Death Penalty: A Reiteration of the Duquesne Poll Data*, 8 Duq.L.Rev. 125 (1970). This study re-evaluated data collected by another researcher and came to a different conclusion than that researcher who, on the basis of his data, had concluded that "no significant relationship was found between one's dogmatism level and one's position on capital punishment." Comment, *Witherspoon—Will the Due Process Clause Further Regulate the Imposition of the Death Penalty?* 7 Duq.L.Rev. 414, 430 (1969).