**2013 UT App 92**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,

*Plaintiff and Appellee,*

*v.*

THOMAS B. GINTER,

*Defendant and Appellant.*

Opinion
No. 20110332-CA
Filed April 18, 2013

Third District, Salt Lake Department
The Honorable Robert P. Faust
No. 091901765

Lori J. Seppi, Attorney for Appellant
John E. Swallow and Ryan D. Tenney, Attorneys for Appellee

JUDGE JAMES Z. DAVIS authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN concurred.
JUDGE J. FREDERIC VOROS JR. concurred, with opinion.

DAVIS, Judge:

¶1     Thomas B. Ginter appeals from his convictions for communications fraud and organizing a pyramid scheme. We reverse Ginter's convictions and remand for further proceedings in accordance with this opinion.

### BACKGROUND

¶2     Ginter started an organization called Patriot Money Gifting Program (PMGP) with the intent to create an alternative monetary

system using only liberty coins.[1] Ginter established PMGP out of "concern[ for] people's souls," based on his beliefs that the Federal Reserve and Internal Revenue Service are criminal organizations that intend to establish a "cash-less society," that Federal Reserve notes are unconstitutional because they cannot be redeemed for gold or silver, and that the Book of Revelation predicts that microchips will be implanted into everyone caught in the "cash-less society." The microchips, he explained, are "the mark of the beast," and "those who will take the mark of the beast . . . will definitely lose their soul[s]."

¶3    Ginter promoted his beliefs and PMGP on a radio show he hosted, using the pseudonym "Sherlock A. Collins." Samuel Vonn Harris was listening to that show one night in 2003 and "heard Sherlock . . . say[] that you could get silver for $2 an ounce." Harris called the radio station to learn more and then drove to the station that same night to meet with Ginter. Ginter explained to Harris that to get in on the deal he had to put down $2 (in standard U.S. currency) and that as Harris invested more money and recruited more people into the program, he could "graduate" up to higher "boards" and earn greater returns on his investments. In the seven or eight years that Harris participated in PMGP, he invested upwards of $105,975, recruited about 400 people into the program, and allowed Ginter to live with him for five of those years. Rounding up, Harris received only $3,000 in return—far from the "$250,000 home" that Ginter said Harris could get for his initial $2 investment.

¶4    Ginter was eventually charged with communications fraud and organizing a pyramid scheme. During jury deliberations, the jury verbally informed the bailiff that they had "been at a stalemate for the past two hours that they'[d] been deliberating" and asked the bailiff how much longer they would have to "sit and . . . do

---

1. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *State v. Dunn*, 850 P.2d 1201, 1205 (Utah 1993).

nothing." The bailiff "told them that usually they are advised that they would have to go back in and continue the deliberation . . . but [that he] would talk to the judge and let them know what will happen." In response, the court directed the bailiff to bring the jury dinner order forms with the goal of implicitly communicating that the court did "not intend[] to let them go." About two hours later, around 7 p.m., the jury sent a note to the court, stating, "We are at a 7-1 split and have been divided in this way since entering the jury room. Over 3 hours we have made no headway and in fact are farther apart [than] when we started. We do not feel we are getting any closer to a verdict." Over defense counsel's objections, the trial court called the jury back to the courtroom, read the jury a modified *Allen* instruction[2] (Instruction 46), and sent them back to continue their deliberations. About eighteen minutes later, the jury submitted a note asking, "[W]ould the liberty coins qualify as the sale of goods?" The court responded with a note that said, "You must determine the facts based upon the evidence presented." Seven minutes after receiving the court's response to their question, the jury returned with a guilty verdict on both counts. Ginter appeals.

ISSUE AND STANDARD OF REVIEW

¶5      Ginter argues that he was deprived of due process and his right to a fair trial because Instruction 46 impermissibly pressured

---

2. *Allen* instructions originated in *Allen v. United States*, 164 U.S. 492 (1896). In that case, the United States Supreme Court approved the use of supplemental jury instructions to help a deadlocked jury reach a unanimous verdict. *Id.* at 501–02. This type of jury instruction is also referred to as a "dynamite" instruction, "verdict-urging" instruction, *see State v. Lactod*, 761 P.2d 23, 29 & n.2 (Utah Ct. App. 1988), or "hammer" instruction, *see Stallings v. Delo*, 117 F.3d 378, 380 (8th Cir. 1997). When the text of the instruction given varies from that given in *Allen*, the instruction is referred to as a "'modified' *Allen* instruction." *United States v. McElhiney*, 275 F.3d 928, 936 (10th Cir. 2001).

the lone holdout juror to acquiesce to the majority's position.[3] We review this constitutional question for correctness. *State v. Candedo*, 2010 UT 32, ¶ 7, 232 P.3d 1008.

## ANALYSIS

¶6    "[T]he non-coercive use of *Allen* charges" is permitted in Utah because "such charges [are] a reasonable and proper exercise of the court's power to guide the jury to a fair and impartial verdict."[4] *State v. Lactod*, 761 P.2d 23, 30 (Utah Ct. App. 1988).

---

3. Ginter also argues that he was deprived of due process and his right to a fair trial when the bailiff communicated directly with the jury and that his trial counsel was ineffective for failing to object to the communications fraud jury instruction. Ginter was represented by counsel on appeal for these issues and the issues addressed in this opinion, but he also submitted an issue on appeal pro se, asserting that the trial court erred in denying various pro se motions that he filed throughout the proceedings. However, because of the manner in which we resolve the *Allen* instruction issue, we need not address these other issues.

4. Jurisdictions differ as to "the continued propriety of the [*Allen*] instruction because of its perceived tendency to pressure jurors to give up their sincere convictions simply because a majority takes a different view." *Lactod*, 761 P.2d at 29 (citation and internal quotation marks omitted). Indeed, "the indisputable modern trend is to abandon *Allen.*" *United States v. Bailey*, 468 F.2d 652, 668 (5th Cir. 1972), *aff'd on reh'g,* 480 F.2d 518 (5th Cir. 1973) (en banc); *id.* at 667–68 (describing the different approaches to *Allen* taken by various jurisdictions). Some jurisdictions allow trial courts to utilize the American Bar Association's (ABA) version of a verdict-urging instruction. *See, e.g., id.* at 667 (listing the District of Columbia Circuit and Seventh Circuit courts as having adopted the ABA instruction); *People v. Gainer*, 566 P.2d 997, 1009 (Cal. 1977) (noting that the instruction promoted by the ABA appropriately

(continued...)

An *Allen* instruction will be deemed coercive if (1) "the language of the supplemental charge can properly be said to be coercive [per

---

4. (...continued)

"advises the jury of their proper role in a manner which may assist them in their deliberations"), *disapproved of on other grounds*, *People v. Valdez*, 281 P.3d 924, 937 (Cal. 2012). There are also several jurisdictions that "will not tolerate the slightest deviation from the approved [*Allen*] language." *See, e.g., Bailey*, 468 F.2d at 667 (describing the First Circuit, Second Circuit, Fourth Circuit, Sixth Circuit, and Eighth Circuit courts as having "'grave doubts' about *Allen*" and permitting it "to stand only by 'the barest margin'" (quoting *United States v. Kenner*, 354 F.2d 780, 782–84 (2d Cir. 1965))). Other jurisdictions have outright prohibited the use of an *Allen*-type instruction. *See, e.g., id.* (listing the Third Circuit, Arizona, and Montana courts as having abandoned *Allen*); *State v. Thomas*, 342 P.2d 197, 200 (Ariz. 1959) ("No rule of thumb can circumscribe definite bounds of when and where, or under what circumstances [an *Allen* instruction] should be given or refused. . . . This is not in keeping with sound justice and the preservation of human liberties and security. We are convinced that the evils far outweigh the benefits, and decree that its use shall no longer be tolerated and approved by this court."). And then, there are courts that are bound by precedent to uphold certain uses and wordings of *Allen*, despite disagreeing as to the usefulness and propriety of *Allen* instructions. *See, e.g., Bailey*, 468 F.2d at 669 ("We deeply regret being compelled to affirm this conviction. We do so only because we are bound by precedent."). *But see United States v. Bailey*, 480 F.2d 518 (5th Cir. 1973) (en banc) (affirming on rehearing the application of the circuit's *Allen* precedent). Here, in addition to being coercive under the circumstances, *see infra* ¶ 15–16, Instruction 46 is difficult to understand and contains grammatical errors. Given the difficulties in crafting a universally noncoercive modified *Allen* instruction when there is no "prescribed ritual of words," *see Lactod*, 761 P.2d at 30 (citation and internal quotation marks omitted), and the subsequent case-specific litigation this difficulty breeds, we cannot help but question the ongoing utility of *Allen* instructions.

se],"[5] or (2) "it is coercive under the specific circumstances of the case." *State v. Harry*, 2008 UT App 224, ¶ 7, 189 P.3d 98 (alteration in original) (citations and internal quotation marks omitted). Under the second part of the test, we may consider factors such as "any colloquy between the judge and the jury fore[person], circumstances surrounding the giving of the instruction, and consideration of the American Bar Association Standards on Criminal Justice Relating to Trial by Jury." *Lactod*, 761 P.2d at 31 (citation and internal quotation marks omitted). Ultimately, "'the correctness of the charge must be determined by the consideration of the facts of each case and the exact words used by the trial court.'" *United States v. McElhiney*, 275 F.3d 928, 940 (10th Cir. 2001) (quoting *Powell v. United States*, 297 F.2d 318, 322 (5th Cir. 1961)).

¶7      Our decision in *State v. Harry*, 2008 UT App 224, 189 P.3d 98, is instructive here. In *Harry*, after deliberating for over three hours, the jury submitted a note to the trial court stating that they were at a seven-to-one stalemate, prompting the trial court to call the jury back to give them a modified *Allen* instruction. *Id.* ¶¶ 3–4. The jury returned to its deliberations and reached a unanimous guilty verdict twenty-six minutes after being given the modified *Allen* instruction. *Id.* ¶ 4.

¶8      This court determined that although the modified *Allen* instruction provided was not coercive per se, it was coercive under the circumstances. *Id.* ¶ 35. We interpreted the *Allen* instruction provided in *Harry* as singling out the minority juror and requiring her to reconsider her stance. *Id.* ¶ 30. The fact that the jury knew the trial court had been informed "that a single juror was not in agreement with the majority" made "the focus of the modified *Allen* charge on that single juror . . . particularly acute, creating the possibility that the holdout juror might have the mistaken impression that she was being directly and individually instructed by the trial judge to defer to the conclusions of the majority." *Id.* ¶ 32. In other words, once the jury made the trial judge aware that

---

5. Because Ginter's arguments focus solely on the second part of this test, we do not address whether Instruction 46 was coercive per se.

they were split seven to one, "the use of an instruction asking only that dissenting juror to reconsider her view became unacceptably coercive." *Id.* Although the trial court intended to counterbalance the "statements urging acquiescence" by including language in the instruction such as, "'no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence,'" this cautionary language was insufficient to outweigh the coercive effect of "the knowledge [that] one juror stood alone against the others." *Id.* ¶ 31.

¶9 Additionally, we noted that the amount of time it took the jury in *Harry* to reach a verdict after receiving the *Allen* instruction and returning to deliberations—twenty-six minutes—further "suggest[ed] that the sole dissenting juror was, in fact, coerced and instantly acquiesce[d] to the majority." *Id.* ¶ 33 (second alteration in original) (footnote, citation, and internal quotation marks omitted). We also determined that "the instruction was not reasonably within the ABA-recommended standards for verdict-urging instructions" because "the ABA instruction makes no mention of the cost or inconvenience of retrial" and because "[t]he ABA standard does not single out the minority jurors but instead sends an even-handed message" encouraging all jurors to keep an open mind. *Id.* ¶ 34 (additional citation and internal quotation marks omitted) (citing ABA Standards for Criminal Justice Discovery & Trial by Jury § 15-5.4(a)(4) (3d ed. 1996), *available at* http://www.americanbar.org/publications/criminal_justice_secti on_archive/crimjust_standards_jurytrial_blk.html (last visited April 15, 2013)).

¶10 Here, Ginter argues that Instruction 46 and the facts of this case are too similar to the instruction and circumstances in *Harry* to avoid the application of *Harry* as binding precedent. We agree.

¶11 As in *Harry*, Instruction 46 directed only the single holdout juror to reconsider her position. Paragraph 4 of Instruction 46 states,

> If a substantial majority of your number are in
> favor of a conviction, those of you who disagree

should reconsider whether your doubt is a reasonable one since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or even a lesser number of you are in favor of an acquittal, the rest of you should ask yourselves again, and most thoughtfully, whether you should accept the weight and sufficiency of evidence *which fails to convince your fellow jurors* beyond a reasonable doubt.

(Emphasis added.) This paragraph of Instruction 46 is very similar—almost word-for-word—to paragraphs five and six of the modified *Allen* instruction given in *Harry. Cf. id.* ¶¶ 17–18 ("If a substantial majority of your number are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it appears to make no effective impression upon the minds of so many equally conscientious fellow jurors . . . . On the other hand, if a majority or even a lesser number of you are for acquittal, the other jurors ought to seriously ask themselves again, and most thoughtfully, . . . whether they should distrust the weight and sufficiency of evidence which fails to convince several of their fellow jurors beyond a reasonable doubt." (emphasis and internal quotation marks omitted)). The instructions, however, are not identical, and the State highlights these differences to argue that Instruction 46 did not target the holdout juror. According to the State, the language quoted above—"which fails to convince *your* fellow jurors" (emphasis added)—is distinguishable from the language used in *Harry*—"which fails to convince *several* of their fellow jurors," *id.* ¶ 18 (additional emphasis and internal quotation marks omitted). We are not convinced that the use of "several" versus "your" illustrates anything more than a semantic difference between the two *Allen* instructions. Instruction 46 also differs by stating, "[T]he rest of you should ask yourselves," while the *Harry* instruction states, "[T]he other jurors ought to seriously ask themselves," *id.* (emphasis and internal quotation marks omitted). Both instructions, however, ultimately require "those for conviction . . . to reevaluate their positions only if '. . . their fellow *jurors*' [plural] had a reasonable doubt," *see id.* ¶ 30 (emphasis added). The *Harry*

court determined that this instruction "urged only the minority juror to reconsider her position in favor of acquittal, while . . . those for conviction were asked to reevaluate their positions only if '. . . their fellow jurors' had a reasonable doubt." *Id.* The same determination applies to Instruction 46; indeed Instruction 46 urged the holdout juror to reconsider her position regardless of whether she favored acquittal or conviction, while the majority jurors were not asked to reconsider either way.

¶12    Further, the trial court here was informed by the jury that they were split seven to one, and after receiving Instruction 46, the jury returned with a verdict in less than thirty minutes—both of which were factors that the *Harry* court held contributed to creating an atmosphere of coerciveness. Ginter also argues that language in Instruction 46 describing the "expens[e] in time, effort, money and emotional strain" that was involved in the case and would be involved in a retrial essentially gave "the majority more ammunition and increas[ed] the pressure on the holdout juror." Similar comments about costs in *State v. Lactod*, 761 P.2d 23 (Utah Ct. App. 1988), were deemed to be "only stating the obvious," *id.* at 31, while the *Harry* court included "'the avoidance of the societal costs of a retrial both in time and money, and the possible loss of evidence that a new trial would entail,'" as one of the legitimate reasons for giving an *Allen* instruction, *see State v. Harry*, 2008 UT App 224, ¶ 6, 189 P.3d 98 (quoting *Lactod*, 761 P.2d at 30) (additional internal quotation marks omitted). Although "the addition of a comment on expense does not '*necessarily*' make a charge more coercive[,] . . . it [nonetheless] *can*." *See United States v. McElhiney*, 275 F.3d 928, 945 (10th Cir. 2001) (citing *United States v. Mason*, 658 F.2d 1263, 1267 (9th Cir. 1981)).[6] Indeed, though the

---

6. Ginter also argues that the bailiff's communications with the jury amounted to an additional *Allen* instruction. We disagree. All the bailiff did was describe, in general terms, what usually happens in similar situations and state that he would ask the trial court how it wanted to proceed in this specific instance. And the trial judge did, in fact, determine how it wanted to proceed and proceeded accordingly. *Cf. United States ex rel. Clark v. Fike*, 538 F.2d 750, 761

(continued...)

*Harry* court recognized that such language was not necessarily coercive, it ultimately determined that the inclusion of language regarding costs was contrary to "the ABA-recommended standards for verdict-urging instructions," — a factor the *Harry* court weighed in favor of coercion. *See Harry*, 2008 UT App 224, ¶ 34 (citation and internal quotation marks omitted). Accordingly, we also consider this language to contribute to the creation of an atmosphere of coercion.

¶13 Ginter also claims that the omission of language reminding the jurors to treat each other with "respect and deference" promoted a coercive atmosphere for the holdout juror. While "there is no prescribed ritual of words indicating whether the language of an *Allen* charge is coercive," the presence of cautionary language helps counterbalance any coercive effect in the instruction. *Lactod*, 761 P.2d at 30–31 (citation and internal quotation marks omitted); *see also McElhiney*, 275 F.3d at 943. Here, Instruction 46 did contain some cautionary language; however, the presence of the same language plus an additional paragraph of cautionary language was deemed insufficient to counterbalance the coerciveness of the modified *Allen* instruction given in *Harry. See*

---

6. (...continued)

(7th Cir. 1976) (determining that "although blunt," the bailiff's statements to the jury denying its request to ask the court some questions were not coercive and therefore did not amount to an *Allen* instruction, especially when, at the time, it "was the proper response" because the trial judge and defense counsel could not be reached). Likewise, the fact that Instruction 46 did not reiterate that the burden of proof was on the State, but only repeated that the burden was proof "beyond a reasonable doubt," is unavailing in terms of proving coerciveness. Also unavailing are the uncorroborated observations of Ginter's trial counsel that when the jury entered the courtroom to receive the *Allen* instruction, several jurors appeared "exasperated," "in distress," or as though they may have been crying, and the bailiff's vague indication that one juror had threatened to not return if deliberations were to continue beyond that day.

*Harry*, 2008 UT App 224, ¶¶ 11–12, 31–32. The cautionary language in the *Allen* instruction in *Harry* reads,

> In order to bring eight minds to a unanimous result, you must examine the questions submitted to you with candor and frankness and with proper deference to and regard for the opinions of each other. That is to say in conferring together, each of you should pay due attention and respect to the views of the others, and listen to each other's arguments with the disposition to re-examine your own views.
>
> . . . .
>
> You are not partisans. You are judges; judges of the facts. Your sole interest here is to seek the truth from the evidence in the case. Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence; but remember also that after full deliberation and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction.

*Id.* ¶¶ 11–12. The cautionary language in Instruction 46 states,

> Remember at all times that no juror is expected to give up an honest belief he or she may have as to the weight or effect of the evidence; but, after full deliberation and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so.

¶14    In *Harry*, we determined that because "the jury knew that the trial judge had been informed that a single juror was not in

agreement with the majority[,] . . . the focus of the modified *Allen* charge on that single juror was particularly acute." *Id.* ¶ 32. And because of this knowledge, the cautionary statements in the modified *Allen* instruction in *Harry* were "insufficient to counterbalance fully the prior statements urging acquiescence." *Id.* ¶ 31. Thus, we are not convinced that the inclusion of only a portion of the cautionary language from *Harry* in Instruction 46 was sufficient to counterbalance the factors weighing in favor of coercion here, especially where Instruction 46 contains essentially all of the factors that were held coercive in *Harry*.

¶15    The State, on the other hand, argues that the physical circumstances surrounding the giving of Instruction 46 were not coercive. We disagree. Having the bailiff deliver dinner order forms to the jury in response to the jury's question of how much longer they would be required to deliberate implied, at the very least, that the jury was not going to be dismissed any time soon and left open the question of whether the jury would be held overnight. That the trial court's actual intent was expressed outside of the jury's presence does not mean that the gesture did not effectively send the court's message that it was "not intending to let them go." The State also describes as noncoercive the fact that the jury deliberated for what the court considered a normal amount of time (four hours) before communicating their impasse and the fact that Instruction 46 was not given on a weekend or late at night. Additionally, the State contends that when the jury instructions are read as a whole, Instruction 22, directing the jurors to consider each other's opinions, be respectful, and keep an open mind, counterbalances any coercive effect that Instruction 46 may have had. Last, the State argues that the jury's submission of a question to the court after receiving Instruction 46 "shows that the jury in this case continued deliberating." While these latter three arguments tend to weigh in favor of the State, "we cannot say that, given *all* of the factors [discussed], we do not have substantial doubts as to the integrity of the deliberation process." *See McElhiney*, 275 F.3d at 948.

CONCLUSION

¶16    Because we determine that the differences between *Harry* and this case are not significant enough to distinguish the two from each other and preclude the otherwise mandatory application of *Harry*, *see generally State v. Menzies*, 889 P.2d 393, 399 n.3 (Utah 1994) ("Horizontal stare decisis . . . requires that a court of appeals follow its own prior decisions. This doctrine applies with equal force to courts comprised of multiple panels, requiring each panel to observe the prior decisions of another."), we conclude that Instruction 46 was coercive. *Cf. State v. Harry*, 2008 UT App 224, ¶¶ 27–34, 198 P.3d 98; *People v. Roche*, 658 N.Y.S.2d 16, 16 (N.Y. App. Div. 1997) ("The formerly deadlocked jury announced its verdict convicting the defendant at a relatively brief interval subsequent to the delivery of the *Allen* charge and without any intervening communication with the court. Under these circumstances, we see no way of conclusively discounting the erroneous instruction as a factor in the eventuation of the guilty verdict."). Ginter's due process rights were violated by the coerciveness of this instruction. The trial court "may not coerce the jury into returning a verdict because this amounts to a denial of a fair and impartial jury trial and is, therefore, a denial of due process." *Lactod*, 761 P.2d at 31 (citing *Mills v. Tinsley*, 314 F.2d 311, 313 (10th Cir. 1963)). Accordingly, we reverse and remand for further proceedings in accordance with this opinion.

———————

VOROS, Judge (concurring):

¶17    I concur in the majority opinion and write separately only to state my belief that it is time to rewrite the *Allen* instruction. That instruction derives from an 1896 jury charge:

> These instructions were . . . , in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor,

and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Allen v. United States*, 164 U.S. 492, 501 (1896). According to the *Allen* court itself, these instructions "were taken literally from a charge in a criminal case which was approved of by the supreme court of Massachusetts in *[Commonwealth] v. Tuey*, 8 Cush. 1, and by the supreme court of Connecticut in *State v. Smith*, 49 Conn. 376, 386." *Id.* Those cases were issued in 1851 and 1881 respectively. In other words, the instructions used in this case and in *State v. Harry*, 2008 UT App 224, 189 P.3d 98, were basically an 1851 instruction as modified by a century and a half of tinkering. The result is an unwieldy instruction that has resulted in two reversals in five years.

¶18    I realize that prudence often counsels in favor of continuing to do what has worked in the past. But as *Harry* and the present case demonstrate, what has worked in the past has not always worked well. In my view, a fresh verdict-urging instruction designed from the ground up could achieve the legitimate goals of the *Allen* instruction while both protecting defendants' rights and preserving just convictions.

———————