**2021 UT App 11**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CESAR R. MARTINEZ,
Appellant.

Opinion
No. 20180153-CA
Filed February 4, 2021

Fifth District Court, St. George Department
The Honorable Eric A. Ludlow
No. 161500109

Staci A. Visser and Ann M. Taliaferro, Attorneys
for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGE GREGORY K. ORME concurred. JUDGE MICHELE M.
CHRISTIANSEN FORSTER concurred, with opinion.

POHLMAN, Judge:

¶1      Cesar R. Martinez appeals his convictions for one count of
rape of a child and three counts of sodomy on a child. He asserts
that he is entitled to a new trial on three grounds. First, he
contends that because he is unable to reconstruct the record
surrounding a deadlock instruction given to the jury, he has
been denied due process and his constitutional right to an
appeal.[1] Second, he contends that the district court committed

_____

1. A deadlock instruction "is a supplemental jury instruction
given by the court to encourage a deadlocked jury, after
                                                    (continued…)

reversible error in failing to comply with rule 15.5 of the Utah Rules of Criminal Procedure when it admitted the prior recorded statement of the child victim (Victim). Third, he contends that his trial counsel was constitutionally ineffective in failing to object to the admission of evidence that he had shown pornography to Victim. We reject these contentions and affirm.

BACKGROUND[2]

¶2 After allegations surfaced in early 2016 that Martinez sexually abused Victim, his then five-year-old daughter, the State brought criminal charges against him. Martinez faced a jury trial in 2017 on one count of rape of a child and three counts of sodomy on a child.

*The Trial*

¶3 Six witnesses testified during the State's case-in-chief: Victim, her mother (Mother), her teenage brother (Brother), her daycare provider, a doctor who examined her, and a Children's Justice Center supervisor. Martinez was the sole witness for the defense.

¶4 Mother testified that in 1999 she and Martinez moved from El Salvador to Utah. The couple had three sons and a daughter, and they established businesses in the food industry. Although they "los[t] everything" in 2010, they rebuilt and ran another business. But the family suffered a tragic loss when their

---

(…continued)
prolonged deliberations, to reach a verdict." *State v. Bess*, 2019 UT 70, ¶ 3 n.2, 473 P.3d 157 (cleaned up).

2. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Pinder*, 2005 UT 15, ¶ 2, 114 P.3d 551 (cleaned up).

eldest son died in 2014. According to Mother, "everything changed after that," including her relationship with Martinez. For example, during the six months before January 2016, the couple had no sexual relations.

¶5 Mother testified that Victim's behavior changed around the same time. For instance, Mother saw Victim touching and rubbing "her private part." She also noticed that Victim refused to give Martinez hugs and kisses. Additionally, Mother and Brother observed that Victim made "a big deal" of not wanting to go to bed at night. Both witnesses testified that Martinez usually put Victim to bed and would stay in her room with the door closed for "long periods of time," perhaps "one to two hours." Of Victim's behavior, Mother said, "Now I understand why."

¶6 Mother described one night in January 2016 when she was at home with her children and Martinez was at work. While sitting on the couch with Victim, Mother noticed that Victim was acting "anxious and angry." When Mother asked Victim what was wrong, Victim told her, "I want to tell you something, but [my brothers] are here." Once her brothers left the room, Victim told Mother, "It's . . . something inappropriate about daddy." Victim then nervously said, "[H]e put away his clothes and put his bee-bee in my butt." Knowing that Victim used the term "bee-bee" to refer to a penis or vagina, this news shocked Mother. She asked Victim when this would happen. Victim responded, "A lot of times. . . . [S]ometimes you was asleep, and then other time[s] you wasn't at home." Victim indicated that she did not tell Mother before because Martinez had told her to be quiet and not to say anything. Mother asked her whether she was hurt, and Victim responded, "When he did this, no, but when he did this, put his tongue in my bee-bee and do this hard, that is hard."

¶7 Mother and Brother both testified as to what happened next. That same night, Mother told Brother and her other teenage son (Older Brother) what Victim had just disclosed. After Victim went to sleep, Martinez arrived home, and Mother

and her sons confronted him. Standing next to the door and with a baseball bat in hand, Older Brother warned Martinez, "We already know what you did to [Victim]." Martinez "started to laugh" and "didn't take it seriously at all." Mother told Martinez that Victim said that he "did something to her," to which Martinez responded, "I didn't do anything. Someone is telling her to say this. . . . [T]ake [Victim] to a doctor and you will see nothing happened." Martinez also said that he wanted to talk to Victim and "find out what happened," but the others told him that he "wasn't going to be alone with her."

¶8    When Mother announced her intention to call child protective services, Martinez told her that she would "ruin everything," and he threatened to disown everyone in the family but Victim. Martinez went on to accuse others of doing something to Victim, including their daycare provider's son and Martinez's nephew. He also said that "it could have been" Brother and Older Brother. Older Brother replied that Victim "didn't say any names," she said "daddy." Still laughing, Martinez denied doing anything to Victim. Eventually, the family went to sleep, with Martinez in his bedroom and Mother in Victim's bedroom.

¶9    The next day, Mother called child protective services, and Martinez went to Las Vegas for work. Victim also approached Mother again, telling her that Martinez showed her "pictures in his tablet." When Mother asked what kind of pictures, Victim explained, "People that you aren't supposed to see, people naked, people doing things, and I—and he tried to make me pick one. I have to pick one of the pictures." Martinez had a tablet for work, which he took with him to Las Vegas. Generally, only Martinez and Victim had access to the tablet, and Brother observed that when he asked to use the tablet, Martinez would stay nearby and "wouldn't let [the sons be] alone with it." When asked whether she had ever seen Martinez look at naked pictures on the tablet, Mother responded that she had not seen him do so but that she had seen him watch pornography on television in their bedroom.

¶10    During Victim's trial testimony, Victim said that Martinez did "bad things" to her in her bedroom, Mother's bedroom, and the living room when Mother and her brothers were at work, gone during the day, or watching television in another room. Victim testified that Martinez would put her to bed at night with the door closed and that he would take off all his clothes and ask her to do the same. Victim then explained, "[H]e had his bee-bee and put it in my bum, and he had his bee—tongue and touched it on mine . . . ." Victim clarified that "bee-bee" means "private part," and she indicated that Martinez's "bee-bee" touched her "front" private part. She said that "private parts in the front" of a boy are a "bee-bee" and that the private parts on the back are a "[b]um," but when asked what she calls "the private parts on a girl on the front," she said she did not know. Victim also said that one time in Mother's bedroom, Martinez "put chocolate on his bee-bee" and told her "to suck it, but [she] said no." And when asked to describe Martinez's "bee-bee," Victim answered, "A long straight line like—and then at the top there's holes—there's a big hole."

¶11    A few days after Victim disclosed the abuse, Mother took Victim to the Children's Justice Center to be interviewed (the CJC interview). During the CJC interview, Victim said that when she was four and five years old, Martinez "took his pants off and he was putting it in [her] bee-bee." He also "put it in [her] butt." She said "he wanted [her] to put his bee-bee in [her] mouth, and [she] did not like that." She explained that she "said yes one time" but another time she said no. Victim further indicated that "[m]ore than one time" Martinez touched his tongue to her "bee-bee." Additionally, when the interviewer asked Victim whether she had "ever seen any pictures of any of the things that [they] talked about," Victim answered, "Well, I saw pictures [on Martinez's] tablet," and explained that Martinez showed her pictures of a "bee-bee." When asked whether the pictures were of "a boy bee-bee or a girl bee-bee," Victim responded, "Just like all kinds of them."

¶12   A video of the CJC interview was played for the jury. When the State asked the district court for permission to do so, Martinez's trial counsel told the court, "[W]e've stipulated to foundation, but not to admissibility." Trial counsel then complained, "It's hearsay. She's testified. It shouldn't come in." The court ruled that although it would not allow the video to go back with the jury during deliberations, it would "allow the playing of the tape," reasoning that "there were certain gaps in [Victim's] testimony where she said she couldn't remember certain items." Neither trial counsel nor the court addressed the requirements of rule 15.5 of the Utah Rules of Criminal Procedure before playing the video for the jury, but trial counsel stated that he "still object[ed] to it," and the court told him, "You've got your objection."

¶13   The State introduced testimony from a supervisor of the Children's Justice Center. The supervisor provided additional foundation for the CJC interview and testified that the interviewer who conducted the interview with Victim "just had a baby" and "couldn't be" at trial.

¶14   The doctor who examined Victim a few days after the CJC interview also testified. Over the defense's hearsay objection,[3] the doctor testified that Victim told her, "My dad put his bee-bee on my bee-bee." Victim said this happened skin-to-skin. According to the doctor, Victim identified the location of her "bee-bee" using a picture of a boy and girl; Victim "pointed to the girl in the genital area." When the doctor asked if she was hurt, Victim said, "It didn't hurt, but it did hurt when he put his tongue on my bee-bee. It hurt a lot." Victim also told the doctor, "He made me put my mouth on his bee-bee," and that, more than once, Martinez "put his bee-bee in her butt." In addition, the doctor testified that the physical examination of Victim "was normal" and that "[t]here was no evidence of any acute injury."

---

3. On appeal, Martinez does not challenge the district court's overruling of this objection.

¶15    Victim's daycare provider testified that on the morning of the day that Victim disclosed the abuse to Mother, the daycare provider heard Victim say something that caught her "off guard." According to the daycare provider, Victim was playing with two boys at the daycare when she overheard them "saying potty words." Although the language was "kind of age appropriate," the daycare provider attempted to "put a stop to it." As she initially approached the children, she heard Victim say, "How about put a pee-pee on your mouth." Taken aback, the daycare provider later talked to Victim alone. When asked "why she used those potty words," Victim "shrugged" and seemed "ashamed." She then assured Victim that she "was not mad," and she advised Victim that if anybody is "inappropriate with [her]," Victim should talk to an adult like her parents. The daycare provider added that she could think of "a few instances" when Victim was upset when her father picked her up.

¶16    During a break in the testimony, Martinez's trial counsel raised an objection to the admission of any further evidence regarding Martinez's tablet. Trial counsel argued that such evidence was irrelevant because "[t]his isn't a charge of viewing child pornography or having a child view pornography or lewdness." In response, the State indicated that, as noted in its opening statement, police officers obtained Martinez's tablet but that they did not find any child pornography. Ultimately, trial counsel's objection was resolved with a stipulation. As stated by trial counsel, the parties "stipulated that neither [side] would argue anything about pornography or [tablets] or anything in [their] closing statements."

¶17    Martinez testified in his own defense. He denied abusing Victim, stating, "I could not do something like that to my own daughter." His account of the night of Victim's disclosure differed from the version presented by Mother and Brother. For example, Martinez testified that when he returned to his home that night, he went to his bedroom and found his passport on a table. Mother then told him to leave, saying that he had abused

Victim. Martinez asserted that he did not laugh; instead, he said he felt the allegations against him were "like a shock" and he responded by saying, "I cannot believe what you are telling me." When his sons entered the conversation, Martinez said to them, "How would you feel if . . . somebody said you had done this?" He also asserted that he did not accuse Older Brother, Brother, his nephew, or the daycare provider's son of molesting Victim.

¶18 At 4:38 p.m., the jury retired to deliberate. At 6:30 p.m., the jury was excused for the night. It resumed deliberations at 8:30 a.m. the next day. At 1:46 p.m., the court convened the parties for an on-the-record hearing and stated,

> The record shall reflect that earlier this morning I had counsel in chambers. We were advised that the jury was having a difficult time coming up with a verdict. [Martinez's trial counsel] was kind enough to find the MUJI instruction,[4] and that was instruction No. 14 that [the prosecutor] took a look at, and we submitted it to the [jury]. I understand that the jury reached a verdict.

The court clerk stated that the verdict came in at noon, while the court thought "it was about 12:35." The court then asked the parties whether "[a]ny record needs to be made before" bringing in the jury, and neither side indicated such a need. The jury returned to the courtroom with a unanimous guilty verdict on all counts. Martinez appeals.

### The Rule 11 Proceedings

¶19 Before the appellate briefing process began, Martinez—represented by new counsel—filed in the district court a Statement of Proceedings pursuant to rule 11(g) of the Utah Rules of Appellate Procedure. In the filing, Martinez identified

---

4. *See generally* Model Utah Jury Instructions 2d CR218 (2018).

"a potential issue on appeal regarding the instructions given to the jury after it became deadlocked during deliberations" and asserted that "there is a gap in the record concerning the communications from and to the jury, the communications between counsel and the trial court, the instruction actually given the jury, and how the jury actually received such instruction." Based on his own investigation and contact with the jurors, Martinez proposed a summary of the proceedings to fill that gap. He also provided a copy of the deadlock instruction (Instruction 14), which he had obtained from the clerk of the district court. Instruction 14 stated,

> As you have seen, this kind of a trial is a difficult, exhausting enterprise for everyone involved. So before we conclude that you are unable to reach a verdict, the Court is asking that you make one more good faith attempt to come to a verdict.
>
> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous.
>
> It is your duty to consult with one another and to deliberate. Your goal should be to reach an agreement if you can do so without surrendering your individual judgment.
>
> Each of you must decide the case for yourself, but do so only after impartially considering the evidence with your fellow jurors.
>
> Do not hesitate to reexamine your own views and change your position if you are convinced it is mistaken. But do not surrender your honest conviction as to the weight or effect of the evidence

> solely because of the opinion of your fellow jurors, or just to return a verdict.
>
> You are the judges—judges of the facts. Your sole interest is to determine the truth from the evidence in the case.
>
> The Court also directs the jury to re-examine all of the jury instructions, with an emphasis on instructions 2, 4, 7, & 8. Consider the instructions as a whole.

Martinez represented that while the parties had stipulated to giving Instruction 14 to the jury, it was "unclear from the record and investigation how exactly the jury was given" Instruction 14. Finally, he asked the court to supplement the record with his proposed summary or, in the event the State objected, to hold an evidentiary hearing to clarify "the circumstances under which the jury received [Instruction 14]."

¶20 After the State objected, the district court held an evidentiary hearing on the matter. During the hearing, which was held nearly two years after the trial, Martinez's appellate counsel questioned the district court judge about his memory of the trial. The judge admitted that he had "very few recollections of this case." Although he was unable to recall many of the circumstances surrounding the jury's deadlock and the giving of Instruction 14, the judge was "pretty sure" that Martinez's trial counsel prepared Instruction 14. The judge recalled no specific objections to the instruction and believed that it had been "approved through case law" and was "a MUJI instruction," that is, an instruction from the Model Utah Jury Instructions (MUJI). The bailiff who served during Martinez's trial also testified. He stated that he had no "independent recollection" of Martinez's case but that when a jury is deadlocked, his general practice is to take that information to the judge and then deliver the judge's answer back to the jury. The bailiff did not recall a jury ever being returned to the courtroom for additional instruction.

¶21 The prosecutor who tried the case also testified. He recalled discussing a MUJI instruction in chambers with the judge and Martinez's trial counsel. According to the prosecutor, trial counsel indicated that he would provide the MUJI instruction and, "because it was straight out of MUJI," the prosecutor did not object. The prosecutor admitted, however, that he was "not certain" that his memory of these events "pertained to this case" given that he had other trials with the same judge and trial counsel.

¶22 Martinez's trial counsel also testified. He recalled meeting with the judge and the prosecutor and discussing what to do about the jury being unable to reach a unanimous verdict. He thought the jury had been deliberating for "several hours" by this point—an "abnormally long" time. According to trial counsel, the judge asked for a deadlock instruction, and although trial counsel objected to sending a deadlock instruction to the jury, the judge overruled that objection and instructed counsel to find such an instruction. Trial counsel then emailed the listserv for the Utah Association of Criminal Defense Lawyers, asking for a "good" deadlock instruction or "case law objecting to that." He received a response from an attorney on the listserv who sent him Utah's "new model jury instruction for a deadlocked jury." Trial counsel reported what he had found to the court, and he ultimately emailed the MUJI instruction to the court clerk. This process took "an hour to an hour-and-a-half." Trial counsel remembered going back into the courtroom where the judge read the MUJI instruction "in open court, but the jury wasn't [there]." The judge then said he would send the instruction back to the jury. When asked how long afterward it took for the jury to reach a verdict, trial counsel stated, "Well, as with all [deadlock] instructions, it generally only takes another half hour to an hour and they come back with a guilty [verdict], and that's why I always object to it. It wasn't long."

¶23 In lieu of testifying, seven jurors each completed written questionnaires about the deadlock. They generally agreed that they communicated their deadlock to the court through the

bailiff. Five jurors remembered that the bailiff returned with a response, one juror could not recall who responded, and one juror thought "the judge came in to talk to the jury." As for whether the response was written or verbal, one juror indicated that it was written, two jurors suggested it was verbal, and the rest did not know. Six jurors indicated that the response told them to continue deliberating. When asked how long it took to reach a verdict after receiving the response, some jurors said it took "about 1 hour," one to two hours, "several hours," or "another day," while other jurors could not recall.

¶24 At the end of the hearing, the district court asked the attorneys, "[W]here do I go from here? Do you have your record that you'd like?" Martinez's appellate counsel responded, "I believe so," and the hearing concluded. The court took no further action.

## ISSUES ON APPEAL

¶25 Martinez advances three issues on appeal. First, he contends that he has been denied due process and his constitutional right to an appeal "where the record cannot be adequately reconstructed surrounding the deadlock instruction" given to the jury. Second, he contends that the district court erred in failing to comply with rule 15.5 of the Utah Rules of Criminal Procedure when it admitted the CJC interview. Third, he contends that his trial counsel was constitutionally ineffective in failing to more forcefully pursue his objection to the admission of evidence that Martinez had shown pornography to Victim.

## ANALYSIS

¶26 Each issue that Martinez raises on appeal has a preservation problem. We therefore first set forth the preservation rule and its relevant exceptions before we address Martinez's arguments.

¶27   "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. The preservation rule "applies to every claim, including constitutional questions." *Salt Lake City v. Kidd*, 2019 UT 4, ¶ 31, 435 P.3d 248 (cleaned up). "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *Johnson*, 2017 UT 76, ¶ 15 (cleaned up). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (cleaned up). The preservation requirement "puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12, 435 P.3d 255 (cleaned up). Preservation is also important because it "allows an issue to be fully factually, procedurally, and legally developed in the district court." *Id.* ¶ 10 (cleaned up).

¶28   "When an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of" an exception to the preservation rule "to persuade an appellate court to reach that issue." *Johnson*, 2017 UT 76, ¶ 19. Two recognized exceptions are relevant here: ineffective assistance of counsel and plain error. *Id.*

¶29   To prove ineffective assistance of counsel, a defendant must establish both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the first element, the defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. The second element requires that the defendant show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* In analyzing this element, courts "consider the totality of the evidence before the judge or jury," recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96. Moreover, "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (cleaned up). We evaluate an ineffective assistance of counsel claim raised for the first time on appeal as a matter of law. *See State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344.

¶30    To prove plain error, "a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Johnson*, 2017 UT 76, ¶ 20 (cleaned up). "An error is harmful when . . . [it] is of such a magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant." *State v. Beverly*, 2018 UT 60, ¶ 37, 435 P.3d 160 (cleaned up). Importantly, "the prejudice test is the same whether under the claim of ineffective assistance or plain error." *Id.* (cleaned up). Prejudicial error thus occurs "when there is a reasonable probability that but for the alleged errors, the result of the proceeding would have been different." *State v. Norton*, 2021 UT 2, ¶ 35 (cleaned up).

¶31    With these concepts in mind, we now turn to the three issues raised by Martinez on appeal.

## I. The Deadlock Instruction

¶32    First, Martinez contends that he has been denied due process and his constitutional right to an appeal because "despite a remand hearing, he is unable to reconstruct the record surrounding a deadlock instruction given to the jury." He asserts that "[t]his error prevents appellate review" of the coerciveness

of Instruction 14 under the circumstances.[5] The State acknowledges that there are "some errors in the district court's creation of a record." But it contends that Martinez has not shown prejudice. According to the State, "prejudice is limited to the court's inability to review only preserved claims," and because "the record gaps all relate to an unpreserved coercion claim," Martinez "is not entitled to a new trial based on a violation of his right to appeal." We agree with the State.

¶33 To give our analysis context, we begin with an overview of the law on deadlock instructions.[6] "Utah courts have repeatedly upheld the use of deadlock instructions as a permissible way to guide the jury to a fair and impartial verdict, so long as the instruction is not coercive." *State v. Bess*, 2019 UT 70, ¶ 58, 473 P.3d 157 (cleaned up). A particular deadlock instruction "will be deemed coercive if (1) the language of the supplemental charge can properly be said to be coercive per se, or (2) it is coercive under the specific circumstances of the case." *State v. Ginter*, 2013 UT App 92, ¶ 6, 300 P.3d 1278 (cleaned up). Thus, there are two types of challenges to deadlock instructions. *See id.* Importantly, each type of challenge must be preserved,

---

5. Although Martinez suggests in his opening brief that perhaps "the jury did not actually receive" Instruction 14, he acknowledged at oral argument before this court that the record shows Instruction 14 was, in fact, delivered to the jury. It is uncertain, however, whether the instruction was delivered in written or verbal form and whether it was delivered by the judge or the bailiff.

6. This kind of jury instruction is also called an "*Allen* instruction" or "an *Allen* charge," named after the case in which the United States Supreme Court "approved the use of supplemental jury instructions to help a deadlocked jury reach a unanimous verdict." *State v. Ginter*, 2013 UT App 92, ¶¶ 4 n.2, 13, 300 P.3d 1278 (cleaned up) (citing *Allen v. United States*, 164 U.S. 492, 501–02 (1896)).

and this court has held that an objection at trial based on the ground of coercion per se "does not preserve for appeal" the alternate ground of coercion under the circumstances. *See State v. Dalton*, 2014 UT App 68, ¶¶ 54–55, 331 P.3d 1110 (cleaned up). Martinez does not argue that Instruction 14 was coercive per se; instead, his underlying claim is that Instruction 14 was coercive under the circumstances.

¶34    The parties agree that a defendant may be entitled to a new trial based on an inadequate record if he can establish three conditions.[7] First, he must show that the district court erred in creating a record of the proceedings. *See State v. Burnside*, 2016 UT App 224, ¶ 51, 387 P.3d 570 (explaining that "all district court proceedings must be recorded" and that "the failure to ensure a complete record of proceedings meets the standard for obvious error by the trial court"). Second, he must show that the record cannot be reconstructed, through no fault of his own. *See West Valley City v. Roberts*, 1999 UT App 358, ¶¶ 11–13, 993 P.2d 252 (indicating that the "lack of an adequate record constitutes a basis for remand and a new hearing only where," among other things, "the record cannot be satisfactorily reconstructed (i.e., by affidavits or other documentary evidence)" through "no fault of the appellant[]"). Third, he must show prejudice, meaning that any remaining gaps in the record substantially affect his ability to appeal a preserved issue. *See State v. Menzies*, 845 P.2d 220, 228 (Utah 1992) (explaining that a defendant's burden to show prejudice is not satisfied by the mere existence of transcription errors); *State v. Russell*, 917 P.2d 557, 559 (Utah Ct. App. 1996) (stating that reversal on the ground of an incomplete record

---

7. This court has stated that one of the conditions for remand is that "the appellant timely requests the relevant portion of the record." *West Valley City v. Roberts*, 1999 UT App 358, ¶ 11, 993 P.2d 252; *accord State v. Davis*, 2013 UT App 228, ¶ 90, 311 P.3d 538, *abrogated on other grounds as recognized by State v. Lyden*, 2020 UT App 66, ¶ 34 n.6, 464 P.3d 1155. That condition is not disputed here.

would be appropriate only if the defendant showed "that a specific error occurred and that the missing record was critical to its resolution" and stating that the record must be "adequate to review specific claims of error *already raised*" (emphasis added)).[8]

¶35 Although the parties agree that the first condition is met and we assume, without deciding, that the second condition is met here, Martinez has not satisfied the third condition. In particular, he has not shown that he preserved the underlying issue of whether Instruction 14 was coercive under the circumstances, and because he did not preserve this issue, he cannot show prejudice. The lack of preservation prevents us from reaching the merits of the issue, and thus, his ability to appeal the issue is not affected by any gaps in the record.

¶36 As discussed, the issue of whether a deadlock instruction is coercive under the circumstances must be specifically raised before the district court for it to be preserved for appeal. *See*

---

8. Martinez takes issue with the State's assertion that "a defendant must show that a *preserved* error exists in the missing record." (Emphasis added.) Yet this court has explained that Utah law "does not require a complete record so appellate counsel can go fishing for error; it only requires that there be a record adequate to review specific claims of error *already raised*." *State v. Russell*, 917 P.2d 557, 559 (Utah Ct. App. 1996) (emphasis added); *see also State v. Menzies*, 845 P.2d 220, 233 n.47 (Utah 1992) ("In dealing with the prejudicial effect of transcript omissions in noncapital cases, courts have focused on whether the omission impacted issues that had been preserved at the trial level and raised on appeal."). Martinez's position might have more persuasive force if the remaining gaps in the record potentially obscured an objection from trial counsel on the specific underlying claim of error. But as discussed, *infra* ¶ 39, the remaining gaps would not reveal that Martinez actually preserved the underlying claim (coercion under the circumstances), and Martinez does not argue otherwise.

*Dalton*, 2014 UT App 68, ¶¶ 54–55. Here, Martinez's trial counsel did not argue to the district court, either at trial or in his post-trial motion, that Instruction 14 was coercive under the specific facts of the case.

¶37　At trial, counsel was given the opportunity to make a record after the jury delivered its verdict, but there is no indication that he lodged an objection that Instruction 14 was coercive under the circumstances. It is true that the district court failed to record the in-chambers conference that occurred when the jury indicated that it was deadlocked. *See generally Burnside*, 2016 UT App 224, ¶ 51 (explaining that "conferences in chambers and at the bench, not just . . . more formal proceedings in open court," must be recorded). But the court attempted to remedy this omission by orally summarizing the in-chambers conference when the courtroom proceedings resumed. The court stated that during the conference, "[Martinez's trial counsel] was kind enough to find the MUJI instruction, and that was instruction No. 14 that [the prosecutor] took a look at, and we submitted it to the [jury]." The court's summary did not indicate *any* objection from either party. And when the court asked whether "[a]ny record needs to be made before" bringing in the jury, the parties declined to add anything to the record. Thus, Martinez's trial counsel did not assert a coercion-under-the-circumstances objection to Instruction 14 during the trial itself. Similarly, even though he could have engaged in post-trial investigation on the subject, he also did not raise such an argument in his motion for a new trial.[9]

---

9. For example, trial counsel would have been aware of how much time elapsed between the delivery of the instruction and the verdict. If the timing or any other circumstance raised red flags, counsel had nearly five months between the verdict and the filing of his post-trial motion during which he could have investigated further and raised the issue of coerciveness with the district court.

¶38 Significantly, even in the rule 11 proceedings to reconstruct the record, Martinez's trial counsel did not testify to having raised an argument about coercion under the circumstances. Rather, trial counsel testified at the rule 11 proceedings that he "did object to sending an *Allen* instruction back" and that he "always objects" to deadlock instructions because "it generally only takes another half hour to an hour and [the jury] comes back with a guilty [verdict]." Although Martinez claims trial counsel's stated objection was "to actually giving [Instruction 14] to the jury under the circumstances," thereby preserving the coercion-under-the-circumstances issue, we are not persuaded. Trial counsel's stated objection was a general objection to the giving of any deadlock instruction, and the district court was justified in denying that general objection in light of Utah's case law approving the use of deadlock instructions. *See Bess*, 2019 UT 70, ¶ 58. Trial counsel did not indicate at the rule 11 proceedings that he ever complained about *facts specific* to Martinez's case that would make Instruction 14 coercive under the circumstances. Given trial counsel's testimony and that the judge and the prosecutor had less detailed memories of the trial and neither could recall any objections from trial counsel, there is no evidence that Martinez ever raised the specific argument that Instruction 14 was coercive under the circumstances.

¶39 Moreover, we are confident that a coercion-under-the-circumstances argument, had it been made, would not be discovered in the remaining gaps in the record. Martinez maintains that the record remains unreliable "as to the when, where, and how the jury received the instruction to continue deliberating." For example, Martinez notes that there is conflicting evidence on whether Instruction 14 was delivered in verbal or written form and whether it was delivered by the judge or the bailiff. Martinez also observes that the jury's communications to the court about the deadlock are not in the record and that there is conflicting evidence on exactly how long the jury deliberated before and after receiving Instruction 14. But trial counsel was not present at any of these junctures and thus

could not possibly have raised any objections during these gaps in the record. We therefore conclude that even considering the remaining gaps in the record, Martinez did not raise an argument before the district court that Instruction 14 was coercive under the circumstances. As a result, he did not preserve the issue for appeal.

¶40 Because Martinez did not preserve the issue of whether Instruction 14 was coercive under the circumstances, we are precluded from considering the issue unless he has established the applicability of an exception to the preservation rule. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. But he has not raised or argued that any exception would apply here. Consequently, we are unable to review the issue of coerciveness under the circumstances regardless of any gaps in the record. Because his ability to appeal the issue has not been affected by the gaps in the record, but rather is due to trial counsel's decision not to object to the circumstances surrounding the giving of the deadlock instruction, Martinez has not shown prejudice resulting from the incomplete record. We therefore will not reverse and remand for a new trial on this ground.

## II. The CJC Interview

¶41 Martinez next contends that the district court erred in admitting the CJC interview without complying with rule 15.5 of the Utah Rules of Criminal Procedure, which governs the admission of previously recorded statements of child abuse victims. In particular, Martinez asserts that the court failed to find that "the person conducting the interview of the child in the recording is present at the proceeding and is available to testify and be cross-examined by either party" and that the recording "is sufficiently reliable and trustworthy." *See* Utah R. Crim. P. 15.5(a)(6), (a)(8). He asserts that this issue was preserved, but he alternatively argues it under the rubrics of plain error and ineffective assistance of counsel. The State concedes that district courts "generally must make written or oral findings on each factor under rule 15.5," but it contends that Martinez did not

preserve the issue and that his ineffective assistance claim fails on its merits. We conclude that Martinez did not preserve the issue. We further conclude that he has not demonstrated prejudice and that, as a result, Martinez cannot succeed under the rubric of either plain error or ineffective assistance.

¶42 Martinez first argues that he preserved this issue at trial and through his post-trial motion. We disagree. During trial, Martinez represented to the court that with regard to the CJC interview, the parties had "stipulated to foundation, but not to admissibility." Through this stipulation, Martinez declined to agree to the CJC interview's admissibility. He then lodged an objection on hearsay grounds, and the court denied it. But in raising the hearsay objection, Martinez did not object to the admissibility of the CJC interview on rule 15.5 grounds. He thus failed to preserve such an objection because he did not specifically present the rule 15.5 issue to the court "in such a way that the court ha[d] an opportunity to rule on it." *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (cleaned up). Furthermore, Martinez's motion for a new trial did not preserve the issue because Martinez could have, at trial, raised a rule 15.5 objection based on the interviewer's absence and the CJC interview's reliability. *See State v. Fredrick*, 2019 UT App 152, ¶ 21, 450 P.3d 1154. Indeed, "raising an objection that could have been raised at trial for the first time in a post-trial motion is insufficient to preserve the issue for appellate review, because doing so deprives the trial court of an opportunity to address the claimed error, and if appropriate, correct it." *See id.* (cleaned up); *cf. State v. Norton*, 2021 UT 2, ¶¶ 94–95, 99 (deciding that an issue regarding jury instructions and the use of a general verdict form was unpreserved when, although the issue was raised at sentencing, "it was too late" for the district court to "respond[] to [the defendant's] concerns"). For these reasons, Martinez did not preserve this issue.

¶43 Given that Martinez's rule 15.5 objection is unpreserved, he asks that we review the issue for plain error and ineffective assistance of counsel. He thus argues that the district court

committed an obvious and harmful error by failing to make the required findings under rule 15.5 before admitting the CJC interview.[10] He also argues that his trial counsel was constitutionally ineffective when he failed to object under rule 15.5 that "the actual interviewer was not present at trial."

¶44   As discussed, "plain error and ineffective assistance of counsel share a common standard of prejudice." *State v. Mitchell*, 2013 UT App 289, ¶ 40, 318 P.3d 238 (cleaned up). To succeed under either framework, Martinez must show that "there is a reasonable probability that but for the alleged errors, the result of the proceeding would have been different." *See Norton*, 2021 UT 2, ¶ 35 (cleaned up). In other words, he has the burden to prove that even if the district court had conducted a rule 15.5 analysis, either sua sponte or in response to a timely objection, the court would have excluded the CJC interview and that, as a result, there is a reasonable probability of a more favorable outcome. *See State v. Popp*, 2019 UT App 173, ¶ 38, 453 P.3d 657; *see also State v. Beverly*, 2018 UT 60, ¶ 37, 435 P.3d 160.

¶45   Martinez has not carried his burden to show prejudice. Although he contends that the admission of the CJC interview was prejudicial because statements made by Victim during the

---

10. The State contends that Martinez's stipulation to foundation "actively waived" or invited error, precluding plain error review. *See generally State v. Moa*, 2012 UT 28, ¶ 27, 282 P.3d 985 (explaining that even plain error review is unavailable when a party invites error). This presents a complicated question in this case because the extent of Martinez's stipulation to foundation is somewhat unclear. Although the State makes some good points, we do not resolve this question. Because we ultimately conclude that Martinez's claims of plain error and ineffective assistance both fail for lack of prejudice, we will assume for the sake of argument that Martinez did not invite or actively waive the error, and we will proceed to analyze the merits of Martinez's plain error and ineffective assistance arguments.

interview were "necessary to establish all of the elements of the multiple charges," he has not demonstrated that the district court would have excluded the CJC interview had the court properly analyzed it under rule 15.5. In particular, Martinez has not shown that had the court evaluated whether the CJC interview was "sufficiently reliable and trustworthy," *see* Utah R. Crim. P. 15.5(a)(8), the court would not have admitted it into evidence. Though Martinez labels the interview as "unreliable," he never explains why. He does not identify a single problem with the interview technique or any other concern that would have led the court to question the interview's reliability. Additionally, Martinez has not shown that the CJC interview would have been excluded based on the interviewer's absence from trial. *See id.* R. 15.5(a)(6). The State argues that had the court or Martinez taken issue with the interviewer's absence, it likely would have moved for a continuance so that it could secure the interviewer's presence at another time. Martinez offers no rebuttal to the State's argument or any reason to conclude that it is likely the court would have excluded the CJC interview rather than continue the trial or otherwise secure the interviewer's participation.

¶46 Without showing that it is reasonably likely that the CJC interview would have been excluded, Martinez cannot show a reasonable likelihood that trial counsel's deficiencies and the district court's failure to make rule 15.5 findings would have altered the evidentiary picture. He thus has not demonstrated a reasonable probability of a more favorable outcome. Accordingly, his claims of plain error and ineffective assistance of counsel based on rule 15.5 are unavailing.

### III. The Evidence of Showing Pornography to Victim

¶47 Lastly, Martinez challenges the admission of the testimony that he showed Victim pornography on his tablet, claiming it was "other bad act evidence" under rule 404(b) of the Utah Rules of Evidence that was "unnoticed, inadmissible, and prejudicial." He acknowledges that although his trial counsel

objected to "some of the pornography evidence," counsel's objection was only "made after substantial evidence had already been admitted" and was "not specifically" made under rule 404(b). Martinez thus asks us to consider this issue under the ineffective assistance exception to the preservation requirement. Accordingly, he contends that his trial counsel was ineffective in failing to lodge a timely and specific objection to testimony about the pornography. We conclude that this ineffective assistance claim fails because Martinez has not established prejudice.

¶48 To show prejudice resulting from his trial counsel's failure to timely object to testimony about his showing pornography to Victim, Martinez must establish that had trial counsel objected and succeeded in excluding the testimony, there is a reasonable probability that the jury would have reached a different result. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶49 Martinez seeks to show prejudice by arguing that the State "focused a substantial amount of its case on showing that [he] had shown [Victim] pornography" on his tablet. He also argues that the testimony undermined his credibility when the case "hinged on credibility determinations" and that the testimony "painted him as a sexual deviant." We are not persuaded.

¶50 First, contrary to Martinez's assertion, the State did not "focus[] a substantial amount of its case" on the claim that Martinez had shown Victim pornography on his tablet. The pornography was mentioned in the State's opening statement and briefly in Victim's CJC interview and Mother's and Brother's trial testimonies. But the vast majority of the State's case-in-chief was concentrated on the charged conduct of rape and sodomy on a child, Victim's descriptions of that conduct, Victim's behaviors, and other circumstantial evidence supporting the charges against Martinez.

¶51 Second, there is no reason to suspect that the testimony about pornography tipped the scales in favor of the jury believing Victim's version of events over Martinez's denials. The same witness—Victim—was the main source of her claimed exposure to pornography and the evidence of the charged conduct. Without evidence corroborating Victim's story about seeing pornography on the tablet, it was unlikely that her unsubstantiated claim led the jury to credit her allegations of abuse. In other words, the fact that Victim claimed Martinez showed her pornography—a claim the State did not independently prove—did not make her claims of abuse any more or less credible.

¶52 Martinez nevertheless stresses that the prosecutor mentioned in opening statement that the police could not "find anything" on his tablet when they searched it. Martinez then complains that the prosecutor's statement suggested that he "intentionally erased [the tablet] after the allegations were made," thus raising an "inference of consciousness of guilt . . . [that] supported [Victim's] credibility" over his. But there was no actual evidence presented that Martinez deleted the pornography, and the jury was instructed that attorneys' statements are not evidence. *Cf. State v. Gilliard*, 2020 UT App 7, ¶¶ 38, 40, 457 P.3d 1128 (stating that instructing the jury that "opening statements were not evidence" mitigated any prejudice from "the mere exposure to the jury of the State's single reference to [certain] potential testimony in opening statements" when that potential testimony was later excluded); *State v. Montes*, 2019 UT App 74, ¶ 37, 442 P.3d 1247 (noting that an opening statement "is not evidence" (cleaned up)). The single statement by the prosecutor was unlikely to sway the jury's credibility determinations.

¶53 Finally, Martinez suggests that testimonial references to pornography prejudiced him because it led the jury to see him "as a sexual deviant." But the evidence before the jury regarding the charged conduct was "far more egregious than" any evidence that Martinez showed pornography to Victim. *See State*

*v. Hatch*, 2019 UT App 203, ¶¶ 30–34, 455 P.3d 1103 (concluding that the defendant was not prejudiced by evidence that he had shown the child victim "a shoebox full of pornographic magazines" where, among other things, the jury heard "far more incriminating" evidence that the defendant committed sodomy on the victim). Indeed, the jury heard much "more inflammatory and graphic testimony" about Martinez when it heard the details of how he raped and sodomized Victim. *See id.* ¶ 31.

¶54   For the foregoing reasons, Martinez has not established that even if his trial counsel performed deficiently by failing to secure the exclusion of testimony about pornography, there is "a reasonable probability that the verdict would have been different absent the excludable evidence." *See State v. Edgar*, 2017 UT App 54, ¶ 13, 397 P.3d 656 (cleaned up). As a result, he cannot establish ineffective assistance of counsel. *See id.*

CONCLUSION

¶55   Martinez's asserted grounds for reversal fail due to the lack of prejudice. Although the district court erred in not keeping a complete record of the proceedings related to the jury's deadlock, Martinez cannot establish prejudice because he did not preserve his underlying claim that the deadlock instruction was coercive under the circumstances. He also has not demonstrated prejudice stemming from the district court's non-compliance with rule 15.5 of the Utah Rules of Criminal Procedure, and his related claims of plain error and ineffective assistance of counsel therefore are unsuccessful. Finally, Martinez has not shown that he was prejudiced by his trial counsel's failure to object to evidence that he showed Victim pornography, and he therefore cannot prevail on his related claim of ineffective assistance. We thus affirm Martinez's convictions.

———————

CHRISTIANSEN FORSTER, Judge (concurring):

¶56    I concur in the majority's determination that the district court's failure to keep a complete record of the deadlock-instruction proceedings was error but that Martinez has not demonstrated that he was sufficiently prejudiced by this lack of a complete record so as to entitle him to a new trial. But I write separately to highlight the importance of the district court's responsibility to record and preserve the record of any in-chambers discussions and any interaction by the court or the court's staff with the jury during its deliberation.

¶57    There is no question that here the district court erred in failing to record the in-chambers discussion with counsel upon being informed of the jury's inability to reach a verdict and to make any record of the communication between the court and the jury and how the jury received Instruction 14 (a copy of the actual instruction was made part of the record more than a year after the trial). "The responsibility of a trial court in what is expressly designated a court of record to ensure that proceedings are properly recorded is a point we made in the first year of this court's existence." *State v. Burnside*, 2016 UT App 224, ¶ 51, 387 P.3d 570. This court has reiterated many times that all proceedings must be recorded, including in-chambers conferences. *See, e.g.*, *State v. Suarez*, 793 P.2d 934, 936 n.3 (Utah Ct. App. 1990); *Briggs v. Holcomb*, 740 P.2d 281, 283 (Utah Ct. App. 1987) ("Although consistently making a record of all proceedings imposes a greater burden on the trial court . . . , it is impossible for an appellate court to review what may ultimately prove to be important proceedings when no record of them has been made.").

¶58    I understand how overworked and overextended the district court judges in this state are, and I acknowledge that counsel bears part of the responsibility "to make certain that the record they compile will adequately preserve their arguments for review in the event of an appeal." *Birch v. Birch*, 771 P.2d 1114, 1116 (Utah Ct. App. 1989) (cleaned up). But here the district court's failure to record the in-chambers discussion with

counsel or to memorialize what interaction occurred with this jury and how Instruction 14 was presented to an apparently deadlocked jury did a disservice to Martinez and his appellate counsel by hampering their attempt to re-create that record two years post-trial.

————————